RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0340p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

LAWRENCE LANDRUM,
    *Petitioner-Appellee/Cross-Appellant,*

    *v.*

BETTY MITCHELL,
    *Respondent-Appellant/Cross-Appellee.*

Nos. 06-4194/4251

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00641—Thomas M. Rose, District Judge.

Argued: April 21, 2009

Decided and Filed: November 4, 2010

Before: BATCHELDER, Chief Judge; BOGGS and GIBBONS, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. Gerald W. Simmons, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. Gerald W. Simmons, Cincinnati, Ohio, Randall L. Porter, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. Warden Betty Mitchell appeals the district court's order granting Lawrence Landrum's petition for a writ of *habeas corpus* on the basis of guilt-phase ineffective assistance of counsel. Landrum cross-appeals the district court's denial of his other claims. Because we find that Landrum has procedurally defaulted his claim of guilt-phase ineffective assistance of counsel, we

1

reverse the district court's grant of *habeas* on that ground and affirm the district court's decision in all other respects.

I.

The Ohio Supreme Court summarized the facts of this case as follows:

On September 19, 1985, Harold White, Sr., the eighty-four-year-old victim, left his second floor apartment where he lived alone to dine at Sir Richard's, a restaurant just north of Chillicothe. After dinner, he went home around 9:15 or 9:30 p.m. When he arrived home, White found burglars in his apartment. Appellant-defendant, Lawrence ("Larry") Landrum, was searching drawers in the kitchen. White, shining a flashlight on him, asked Landrum: "What the hell are you doing in my apartment?" Landrum replied: "I'm going to get all the money and stuff I can." Then White told Landrum to leave immediately: "If you don't get out, I will call the police."

While White and Landrum were talking, Grant Swackhammer, Landrum's fourteen-year-old accomplice, came up behind White and struck White on the head five or six times with a large railroad bolt. He struck some blows after White had fallen. Grant then said: "I killed him." Landrum, joining in, sat astride White and wrestled with him. In the struggle, White tore Landrum's surgical gloves. Landrum then told Grant that White was still alive and to go get the biggest knife that he could from the kitchen. Grant responded and handed Landrum a large kitchen knife.

Landrum has given different versions of exactly what he did next. At trial, Landrum testified that he did not kill White. He denied asking Grant for the knife but admitted Grant handed it to him. Landrum testified that he only threatened White with the knife: "Told him not to move, to stay still and he wouldn't get hurt." Landrum then went through White's pockets, taking his keys and wallet. Landrum further testified that he told Grant to watch White, then laid the knife down and went to another room to search for valuables. Later, Landrum heard hollering and screaming and shouted to Grant to keep White down. Only when Landrum came back did he notice that White's throat was slit. However, Landrum told several witnesses that night that he, and not Grant, had cut White's throat.

Landrum took about $80 and over two hundred nerve pills (Placidyls and Librium) from White's apartment. Landrum kept all the money and pills. When Landrum and Grant left the apartment, they went to Grant's

house, separated, and Landrum then went to the house of his friend, Rick Perry.

At Perry's house, then at a railroad yard, and later at a first floor apartment below White's, Landrum told several juveniles that night the details of the burglary and murder. Landrum told Michael Drew, a seventeen-year-old runaway, that he had just done a job and then described the burglary and murder. He told Drew that he had nodded his head, telling Grant to hit White with the railroad bolt. Landrum showed Drew a bunch of money and also told him that "he slit his [White's] throat from ear to ear." Landrum also warned Drew and the others: "If you guys go to the law, I'll cut your throat just like I did Mr. White's." Drew also described Landrum changing clothes that evening.

Rick Perry, age nineteen, a good friend of Landrum's, testified that he saw Landrum around 11:30 p.m. on September 19 at Perry's house. Landrum told him: "I've got money." "I did a job." "I killed some old man." "I cut his throat." Landrum told Larry Perry, Rick's brother, that: "he had to get out of town because he had just gutted [someone]." He also showed Larry around one hundred thirty Placidyl pills and about the same quantity of Libriums. Landrum counted the pills at the house.

Cary Leasure, age sixteen, was also at the Perry house and later at the railroad yard. Cary testified that Landrum said he encountered White, "and then gave the signal, waved his hand and told his buddy to hit him [White] in the head." When White fell down, Landrum got on top of him and then "told his buddy to go get a knife out of the kitchen drawer." After his buddy gave him the knife, Landrum said, he then "cut the guy's throat."

Karen Hughes Brown, age sixteen, also was at the Perry house and at the railroad yard. Karen said that Landrum told them he and his buddy, Grant, had "broke into Mr. White's house and Grant was supposed to have hit [him] over the head and Larry sliced his throat." Landrum said they had been planning the burglary for a couple of days. Karen went that evening with Larry back to an apartment on the first floor of the same building. Landrum had to get a sweater and pair of pants that he had left. There, Landrum told Karen, "Oh, by the way, there's a dead body above you." Karen testified that Landrum "asked me what I would do if blood started dripping on me from the ceiling and after he did that he asked if I wanted to go upstairs and see the body." That evening, Landrum threatened all the juveniles, "if we told anybody, that he'd slice our throat. He said he sliced one person's throat, so he'd slice another."

On September 20, an anonymous caller phoned the police, and that afternoon, the police forcibly entered Mr. White's second floor apartment. Inside they found White, his throat slit, lying in a pool of

blood. Closet doors were ajar or open, drawers were pulled open with some contents dumped on the floor, and a wooden locked cabinet had been pried open. Police also found two pieces of material later determined to be pieces of gloves.

On September 21, police arrested Landrum for White's murder. On his person, police found a one-way bus ticket to Michigan purchased on September 20. When Landrum was arrested, the tennis shoes he was wearing bore traces of human blood. On September 23, after a grid search, police found a large kitchen knife in a wooded area. Police also found that day in the woods a paper sack containing a bloody towel and washcloth, surgical gloves, a pair of other rubber gloves, and the victim's wallet. At trial, Landrum admitted throwing away the towel and gloves. The knife, towel and washcloth, and one glove, contained human blood, type O, the same blood type as White's. Two fragments of gloves found in the apartment matched torn rubber gloves from the sack in the woods.

A pathologist testified that White suffered multiple lacerations to his head caused by a relatively blunt instrument, possibly the railroad bolt. He found six distinct wounds on White's right forehead, right side of the scalp and back left side. One blow caused a depressed skull fracture which might have proved fatal. White died of massive bleeding from a gaping neck wound. The neck wound, five inches in length, extended to the spine itself; the right carotid artery, windpipe, neck muscles and veins were all severed. At least two cutting episodes were involved. The evidence indicated that the kitchen knife found in the woods could have caused that wound.

At trial, the evidence showed Landrum planned the burglary. Carolyn Brown lived in an apartment below White. Landrum, while visiting Brown on September 17, told her that he was in trouble, needed money and might rob White to get some money. Brown asked Landrum: "What if you rob him and he comes in on you?" Landrum replied: "I'll kill him." Landrum also said that he would use surgical gloves so they could not take fingerprints. In his own testimony, Landrum claimed to have told Brown he would only knock White unconscious. On September 18, Landrum went upstairs to visit White's apartment to "case the joint." Landrum told White he was looking for an apartment to rent and White showed him through his apartment.

Grant Swackhammer had found a railroad bolt, and Grant and Landrum kept the bolt to use later as a weapon. On September 19, Landrum, along with Grant, visited Landrum's girlfriend, Wendy, who had delivered their baby the day before. At the hospital, Landrum showed Wendy some surgical gloves and told her those gloves may make him some money.

> At trial, Landrum admitted essential details of planning and executing the burglary, including the confrontation with White. Although he admitted wrestling with White, he denied he cut White's throat, claiming only to have threatened him with the knife. Landrum did not recall telling various juveniles that he had cut White's throat.
>
> To support his testimony, Landrum relied heavily on two facts. First, the shorts he wore and clothes he was carrying when arrested on September 21 showed no traces of blood. Some witnesses testified he wore those same clothes the night of the murder. Other testimony indicated that he changed clothes.
>
> Second, Landrum raised intoxication as interfering with his intent. Landrum testified that he took some pills and drank six to eight beers that afternoon and fourteen to eighteen beers between 4:30 and 7:30 p.m. on September 19 at Carolyn Brown's apartment. There, Grant and he waited for White to leave so they could break into White's apartment. Several witnesses testified that Landrum appeared high or intoxicated that afternoon and evening. Others testified that Landrum was high on drugs after the murder.
>
> A jury convicted Landrum in February 1986 of aggravated murder and aggravated burglary as charged. The jury found two death penalty specifications: (1) aggravated murder to escape detection for burglary; and (2) being the principal offender in the aggravated murder while committing or attempting aggravated burglary.
>
> Following a sentencing hearing, the jury recommended death. The trial court sentenced Landrum to death, and the court of appeals affirmed the conviction and death penalty sentence.

*State v. Landrum* ("*Landrum II*"), 559 N.E.2d 710, 710–16 (Ohio 1990).

The Ohio Court of Appeals affirmed Landrum's convictions and sentence on January 12, 1989. *See State v. Landrum* ("*Landrum I*"), No. 1330, 1989 WL 4244 (Ohio Ct. App. Jan. 12, 1989). The Ohio Supreme Court likewise affirmed the convictions and death sentence on August 15, 1990. *Landrum II*, 559 N.E.2d at 716. The United States Supreme Court denied *certiorari* in 1991. *Landrum v. Ohio*, 498 U.S. 1127 (1991). Landrum filed a petition for post-conviction relief in the state trial court in May 1996. The trial court denied Landrum's petition in December 1997, and the Ohio Court of Appeals affirmed that decision in January 1999. *State v. Landrum* ("*Landrum III*"), No. 98 CA 2401, 1999 WL 22626 (Ohio Ct. App. Jan. 11, 1999). Landrum applied to reopen

his appeal under Ohio App. R. 26(B) in September 1998. The Ohio Court of Appeals denied the application, finding that Landrum failed to show good cause for delaying his application, and the Ohio Supreme Court affirmed that decision in May 1999. *State v. Landrum* ("*Landrum IV*"), 720 N.E.2d 524 (Ohio 1999).

Landrum filed his petition for a writ of *habeas corpus* in May 1996, an amended petition in May 1999, and a second amended petition in August 2000. Landrum moved to expand the record to include an affidavit in support of his position that he did not procedurally default his claim of ineffective assistance of appellate counsel. The magistrate judge initially denied the motion but granted it upon reconsideration. The magistrate judge ruled in part that Ohio App. R. 26(B) "is not presently firmly established and regularly followed in Ohio capital cases so as to prevent merits review of Mr. Landrum's claims of ineffective assistance of appellate counsel presented to the Ohio courts in his 26(B) application." *Landrum v. Anderson* ("*Landrum V*"), 185 F. Supp. 2d 868, 873 (S.D. Ohio 2002). The district court denied the Warden's objections to the magistrate judge's report and recommendation on January 28, 2003. The court held evidentiary hearings in September 2003 and November 2003 and directed the parties to brief the issues. In a report and recommendation filed November 1, 2005, the magistrate judge recommended granting Landrum a conditional writ on the basis of one of his claims of ineffective assistance of counsel. *Landrum v. Anderson* ("*Landrum VI*"), No. 1:96-cv-641, 2005 U.S. Dist. LEXIS 41846, at *130 (S.D. Ohio Nov. 1, 2005). The district court adopted the magistrate judge's report and recommendation over the Warden's objections. *Landrum v. Anderson* ("*Landrum VII*"), No. 1-:96-cv-641, 2006 U.S. Dist. LEXIS 27510 (S.D. Ohio Apr. 17, 2006). Landrum moved for a certificate of appealability ("COA") as to eight claims, and the Warden did not oppose the motion. The magistrate judge recommended granting the COA as requested, and the district court adopted that recommendation by order entered December 11, 2006. Landrum's eight claims before us are:

> 1. Trial counsel's deficient performance in the trial phase prejudiced Landrum.
>
> 2. The trial court erred when it did not grant Swackhammer immunity.

3. The district court erred when it denied Landrum's motion to supplement the record with the affidavit of reconstruction expert Wayne Hill.

4. The trial court erred in the sentencing phase when it excluded testimony that detailed Landrum's role in the offense.

5. The Ohio Supreme Court erred when it "reweighed" testimony that was never admitted into evidence.

6. The trial court erred when it denied counsel's repeated requests for a continuance.

7. Defense counsel performed deficiently in the mitigation phase to Landrum's prejudice.

8. Landrum did not receive the benefit of a reasonably competent expert in the mitigation phase.

In his appellate brief, Landrum fails to address many of the sub-claims included within the claims certified for appeal. Accordingly, he has waived those sub-claims. *See* Fed. R. App. P. 28(a)(9)(A); *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007). We therefore address only those claims and sub-claims both certified for appeal and briefed by Landrum, noting that Landrum combined his arguments regarding issues four and five.

## II.

In a *habeas* case, filed—as this one was—after the effective date of AEDPA, we review *de novo* the district court's conclusions on issues of law and on mixed questions of law and fact, and review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). Issues of state law cannot form the basis for *habeas* relief. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Estelle*, 502 U.S. at 67 (applying *Lewis* to bar *habeas* review of a state court's decision to apply a state evidentiary rule unless the rule itself violates the federal Constitution).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly-established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. *See* 28 U.S.C. § 2254(d); *Berghuis v. Smith*, 130 S.Ct. 1382, 559 U.S. — (2010); *Irick v. Bell*, 565 F.3d 315, 319–320 (6th Cir. 2009). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the unreasonable application clause, a federal habeas court may grant the writ if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409–11.

In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may consider only the holdings of the Supreme Court's decisions at the time the relevant state court rendered its decision. *See Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *Williams*, 529 U.S. at 412. Our decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). Finally, the *habeas* petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

III.

In his second amended *habeas* petition, Landrum alleged that he was denied effective assistance of counsel during the guilt phase of his prosecution. Although he presented several bases for this claim to the district court, the district court held that the

only valid basis for granting *habeas* relief was counsel's ineffectiveness in failing to seek admission of Rameal (Randy) Coffenberger's testimony during the guilt phase. Landrum argues that Coffenberger would have testified that Swackhammer had confessed to him that it was actually Swackhammer who cut White's throat. As explained below, we conclude that Landrum procedurally defaulted this claim of ineffective assistance of trial counsel. We also conclude that he has not shown cause for us to excuse the default of this claim because he has also procedurally defaulted his ineffective assistance of appellate counsel claim. Finally, we hold that the balance of his guilt-phase ineffective assistance claims are without merit.

## A.

Landrum first raised a claim of ineffective assistance of counsel in his 1996 post-conviction petition in the trial court. He alleged generally that he was denied the effective assistance of counsel during pretrial, the guilt phase, and the sentencing phase. Landrum listed his trial counsel's errors as including the failure to proffer adequately details of the anticipated testimony of Coffenberger[1] and Swackhammer and the failure to request the state to seek immunity for Swackhammer. Landrum did not claim that his trial counsel erred during the guilt phase by failing to attempt to introduce Coffenberger's testimony about Swackhammer's admission. The post-conviction trial court held that *res judicata* barred Landrum's claims because he had new co-counsel on direct appeal and could have raised ineffective assistance of trial counsel then. The Ohio Court of Appeals affirmed the trial court's decision, agreeing that *res judicata* barred Landrum's claims of ineffective assistance of counsel. *Landrum III*, 1999 WL 22626, at *12. The court noted that Landrum's case did not fall within the exception to *res judicata* that applies when the same counsel represents a defendant at trial and on direct appeal because Landrum had new co-counsel on appeal.[2] *Id*. The Ohio Court of

---

[1] Trial counsel sought unsuccessfully to admit the Coffenberger testimony at the sentencing phase and made a statement to the court in the form of a proffer, outlining Coffenberger's anticipated testimony.

[2] Landrum's trial counsel continued to represent him on direct appeal, even though he added new counsel. As we discuss in Part III.C., we addressed this situation in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). Applying *Combs* to Landrum's case, we do not rely on the *res judicata* determination of the Ohio Court of Appeals.

Appeals addressed the merits of some of Landrum's claims that he received ineffective assistance of counsel during the sentencing phase but did not address the merits of his guilt-phase ineffective assistance of counsel claims. *Id.*

Landrum also raised ineffective assistance of trial counsel as an underlying claim in his Rule 26(B) application in the Ohio Court of Appeals. Rule 26(B) requires a defendant to seek a collateral post-conviction remedy for ineffective assistance of appellate counsel rather than raise the issue of appellate counsel's ineffectiveness in a second direct appeal. Landrum alleged in his Rule 26(B) filing that appellate counsel erred by failing to raise ineffective assistance of trial counsel on direct appeal because of trial counsel's errors in, *inter alia*, failing to seek admission of Coffenberger's and Swackhammer's testimony in the guilt phase. The Ohio Court of Appeals dismissed Landrum's petition as untimely, concluding that Landrum did not demonstrate good cause for his delay in filing. The court also found that the issues Landrum sought to raise in his Rule 26(B) application had been raised previously in post-conviction proceedings, and *res judicata* barred relitigation of those issues. The Ohio Supreme Court agreed that Landrum's application was untimely and that he had not shown good cause for the delay. *Landrum IV*, 720 N.E.2d at 524–25.

The district court examined Landrum's claims of guilt-phase ineffective assistance of counsel and concluded that one had merit: the claim that trial counsel should have attempted to introduce at the guilt phase Coffenberger's testimony that Swackhammer confessed to cutting the victim's throat. The district court wrote: "Trial counsel had in Coffenberger's testimony an admission of principal offender status by an admitted co-perpetrator which admission, if believed by the jury, would have prevented imposition of a death sentence."[3] *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at *130. The district court found that trial counsel's belief that the testimony was excludable hearsay constituted deficient performance because the testimony was in fact admissible under Ohio law and there was no strategic reason not to offer the testimony. *Id.*

---

[3]The district court was incorrect in believing that Landrum could not receive the death penalty if a jury believed Swackhammer's admission that he slit White's throat. *See infra* note 4.

Addressing prejudice, the district court wrote that although it was uncertain whether the jury would have believed Coffenberger, a "grave doubt" whether a constitutional error occurred that had a substantial and injurious effect or influence on the verdict led it to grant relief. *Id.* The district court concluded that it was ineffective assistance of trial counsel to fail to present Coffenberger's testimony during the guilt phase and that Landrum's failure to present the claim on direct appeal was excused by ineffective assistance of appellate counsel. *Id.* at *131. The district court rejected Landrum's additional claim that his counsel was ineffective for failing to interview potential witnesses because it found that such testimony would have been cumulative to testimony that was already presented at trial. *Id.* at *174.

## B.

We first consider whether the claim on which the district court granted relief—the failure to present Coffenberger's testimony at the guilt phase—was procedurally defaulted. Although Landrum failed to raise the claim on direct appeal, the district court determined that the failure was excused by ineffective assistance of appellate counsel. We disagree with the district court's analysis on this point and conclude that the failure was not excused because the ineffective assistance of appellate counsel claim was itself defaulted. Moreover, we note that Landrum also failed to raise the claim in his state court petition for post-conviction relief. He failed to exhaust the claim, and no avenues remain available for him to seek relief. Because he was not entitled to counsel in post-conviction proceedings, he cannot seek to excuse this default by claiming ineffective assistance of counsel.

As noted, Landrum made no claim in his direct appeal relating to trial counsel's failure to call Coffenberger as a witness during the guilt phase. The claim was raised only when Landrum filed his Rule 26(B) application in the Ohio Court of Appeals in September 1998. In it Landrum alleged that trial counsel was ineffective in failing to call Coffenberger and Swackhammer at the guilt phase and that appellate counsel was ineffective in failing to raise the issue on direct appeal. That application was found to

be untimely by the Ohio Court of Appeals, a finding affirmed by the Ohio Supreme Court.

Ineffective assistance of appellate counsel can constitute cause to excuse a procedural default. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Howard v. Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005). However, "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In Ohio, defendants claiming ineffective assistance of appellate counsel must apply to the Ohio Court of Appeals for reopening of the direct appeal, as Landrum did. Ohio App. R. 26(B).

The state argues that the claim of ineffective assistance of appellate counsel is defaulted due to Landrum's failure to comply with the state's procedural rule requiring the filing of a Rule 26(B) motion within ninety days. The analysis of this issue is governed by the four-part rule described in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). A federal *habeas* court must first determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the state procedural rule. Second, the federal court must decide whether the state courts actually enforced the state procedural sanction. Third, the federal court must decide whether the state procedural default is an adequate and independent state ground upon which the state can rely to foreclose review of the federal *habeas* claim. Fourth, the *habeas* petitioner can excuse a procedural default by demonstrating cause for his failure to comply with the state procedural rule and prejudice from the alleged constitutional error. *Id.*; *see also Seymour v. Walker*, 224 F.3d 542, 555–56 (6th Cir. 2000).

Our precedents give guidance for application of the *Maupin* test in the Rule 26(B) context. By the time Landrum filed his Rule 26(B) motion in September 1998, "it was well established that claims of ineffective assistance of appellate counsel must be raised in a motion for reconsideration before the Ohio Court of Appeals." *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002) (considering whether Rule 26(B) was an

independent and adequate state procedural rule as of May 1998).  Since at least 1996, Ohio law has provided sufficient guidance on what constitutes "good cause" for a late filing under Rule 26(B).  *Id*. at 578.  Furthermore, as of January 1996, "the time constraints of Rule 26(B) were firmly established and regularly followed."  *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008) (discussing *Fautenberry v. Mitchell*, 515 F.3d 614, 641 (6th Cir. 2008)) (emphasis omitted).  Thus, because Landrum's Rule 26(B) motion was filed beyond the ninety-day period, we conclude that he has procedurally defaulted his ineffective assistance of appellate counsel claim.

Landrum's reliance upon *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006), is misplaced.   In *Franklin*, we considered whether Rule 26(B) was an adequate and independent state procedural bar and held that it was not firmly established and regularly followed.   434 F.3d at 421.   We bolstered our conclusion by describing the Ohio Supreme Court's "erratic" handling of untimely Rule 26(B) applications in capital cases. *Id*. at 420.  However, this analysis is inapplicable here for two reasons.  Both turn on the fact that Franklin's motion was filed June 30, 1993, one day before Rule 26(B) went into effect.  First, because we concluded in *Franklin* that applying Rule 26(B)'s timeliness requirement to cases filed before the effective date of the rule would give the rule impermissible retroactive effect, *Franklin*'s discussion of the Ohio Supreme Court's subsequent treatment of Rule 26(B) is thus *dicta*.  Second, the "firmly established and regularly followed" requirement is measured "as of the time Rule 26(B) was to be applied."  *Parker*, 543 F.3d at 862.  As *Fautenberry* and *Parker* emphasized, although Rule 26(B) was not firmly established in 1993, "it had become firmly established by 1996."  *Id*. at 861–62 (citing *Fautenberry*, 515 F.3d at 641).

Landrum now argues that the state waived its procedural default defense because it focused on Landrum's failure to raise the claim on direct appeal.  "[P]rocedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter."  *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks and citations omitted) (alteration in original); *see also Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006) (noting that the defense of procedural default may be

waived by failing to assert it).  However, this court can consider procedural default when it is raised for the first time on appeal.  *See White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005); *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004).

Landrum's waiver argument is unavailing.  In its third return of the writ, the state presented two specific arguments and one general argument that Landrum had procedurally defaulted some of his claims.  First, the state argued that Landrum procedurally defaulted his ineffective assistance of trial counsel claims because he did not raise them on direct appeal and that he could not rely on ineffective assistance of appellate counsel to excuse that default because the Ohio Court of Appeals rejected his Rule 26(B) application as untimely.  Second, the state argued that Landrum procedurally defaulted forty-three of the forty-five claims he raised in his post-conviction petition because he did not raise them on appeal to the Ohio Court of Appeals.  Third, citing *Wong v. Money*, 142 F.3d 313, 321–22 (6th Cir. 1998), and *Pillette v. Foltz*, 824 F.2d 494, 497–98 (6th Cir. 1987), the state recited that "a constitutional claim presented to the federal courts that does not rest on the *same theory* as was presented to the state courts is procedurally defaulted."  Although the state did not argue specifically that Landrum failed to exhaust his guilt-phase ineffective assistance of counsel claim *regarding Coffenberger's statement*, either in its return of the writ or in later pleadings, the state raised the defense generally and in terms that apply to the claim at issue by citing *Wong* and *Pillette*.  Accordingly, we hold that the state did not waive its procedural default defense to Landrum's claim.

In addition to their arguments about default of the claim based on untimeliness of the Rule 26(B) motion, the parties dispute whether Landrum raised the issue of trial counsel's failure to present Coffenberger's testimony at the guilt phase in his post-conviction petition. The Supreme Court has stated that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-

law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted); *see also Wong*, 142 F.3d at 321–22 (ineffective assistance of counsel claim procedurally defaulted where petitioner's argument in state courts relied upon different grounds than argument on *habeas* appeal); *Pillette*, 824 F.2d at 497–98 (petitioner did not exhaust his state remedies for all ineffective assistance of counsel claims if the state courts were presented with only one aspect of his attorney's performance). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). When the petitioner has failed to present the grounds to the state courts and has exhausted his claims because no state remedy remains available, his grounds are procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *O'Sullivan*, 526 U.S. at 848.

Although Landrum did raise an ineffective assistance of trial counsel claim in his post-conviction petition, he did not include the allegation about introducing Coffenberger's testimony in the guilt phase. In this court, Landrum argues that his general allegation of ineffective assistance of counsel, along with affidavits from his trial counsel and another attorney that were attached to his post-conviction petition, sufficed to have presented the claim to the post-conviction trial court. Landrum's trial counsel's affidavit recited that additional time was needed to develop background information regarding Swackhammer's relative culpability. In the other affidavit, an attorney not involved in the trial opined that Landrum's trial counsel was deficient for failing to present Coffenberger's testimony in the trial phase. Reference to Coffenberger in Landrum's post-conviction petition itself can only be fairly read as a reference to the penalty phase of the trial, not the guilt phase. The affidavits on which Landrum relies did not present the factual basis for the ineffective assistance claim raised here because no corresponding claim was made in the state post-conviction petition and, thus, the state court would have had to read beyond the petition to discover it. *See Baldwin*, 541 U.S. at 32; *Pillette*, 824 F.2d at 497–98.

No state court remedies remain for Landrum to bring an ineffective assistance of trial counsel claim. Ohio law permits second, successive, or untimely petitions only under limited circumstances. Ohio Rev. Code § 2953.23. Successive post-conviction relief petitions are barred unless the petitioner was unavoidably prevented from discovering the facts on which he later seeks to rely, or the United States Supreme Court has recognized a new right that applies retroactively to the petitioner. Ohio Rev. Code § 2953.23(A)(1)(a). In addition, the prisoner must show that, but for the error, no reasonable factfinder would have found the petitioner guilty, or, in a death penalty case, eligible for the death sentence. Ohio Rev. Code § 2953.23(A)(1)(b); *Broom v. Mitchell*, 441 F.3d 392, 400 (6th Cir. 2006). The facts underlying Landrum's ineffective assistance of counsel claim were available to him when he filed his first post-conviction petition and the right to effective assistance of counsel is not one that is newly recognized by the Supreme Court. Moreover, Ohio does not require a defendant to be the principal offender to receive a death specification. *See Ohio v. Herring*, 762 N.E.2d 940, 949–50 (Ohio 2002). Therefore, the statement does not cast doubt on his involvement in the murder—a point the district court did not acknowledge—and Landrum is unable to demonstrate that no reasonable factfinder would have found him eligible for the death penalty if the statement was admitted.[4]

Because Landrum failed to exhaust this claim and no state court remedies remain, he must show cause to excuse his failure to present the claims, as well as actual prejudice to his defense at trial or on appeal. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Landrum cannot rely on ineffective assistance of post-conviction counsel as cause because there is no constitutional right to an attorney in post-conviction proceedings. *See id.* at 752–53; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Further, Landrum cannot excuse his procedural default by showing a fundamental miscarriage of justice because he has not submitted new evidence showing that a

---

[4] Even if the jury believed that Landrum did not personally slit the victim's throat, Landrum would still likely have been convicted of aggravated murder and aggravated burglary, either as an aider and abettor or based on the felony-murder rule. *See* Ohio Rev. Code. §§ 2923.03, 2903.01(B). The district court was simply incorrect in its observation that Swackhammer's admission, if believed, would have prevented Landrum from being sentenced to death.

constitutional violation has probably resulted in a conviction of one who is actually innocent. *See Murray*, 477 U.S. at 495–96.

In sum, we hold that Landrum procedurally defaulted his claim that his trial counsel was constitutionally ineffective for failing to introduce Coffenberger's testimony during the guilt phase because he failed to raise this claim on direct appeal and in his post-conviction petition. Furthermore, we hold that Landrum is unable to excuse this default because he failed to comply with the firmly established and regularly followed timing requirements of Rule 26(B) in bringing his ineffective assistance of appellate counsel claim and because ineffective assistance of counsel is not a basis for excusing the post-conviction proceeding default. Thus, we reverse the decision of the district court granting Landrum a conditional writ of *habeas corpus* on this claim.

C.

In the rest of his guilt-phase ineffective assistance of counsel claims, Landrum argues that counsel failed to conduct a proper investigation and interview potential witnesses, failed to present important lay testimony, and failed to present needed expert testimony. As an initial matter, the procedural default analysis for Landrum's remaining guilt-phase ineffective assistance of counsel claims is complicated by overlapping counsel between Landrum's trial and appeals and the details of Ohio's post-conviction law. Under Ohio law, when the same attorney represents a defendant at trial and on direct appeal, claims of ineffective assistance of trial counsel generally are raised in a post-conviction action and the claims are not barred by *res judicata*. *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 n.5 (6th Cir. 2003) (citing *State v. Cole*, 443 N.E.2d 169, 171 n.1 (Ohio 1982)). When a defendant is represented by new counsel on direct appeal, *res judicata* bars the defendant from raising the issue of ineffective assistance of trial counsel in later proceedings if the issue could fairly have been determined on direct appeal without resorting to evidence outside the record. *See Monzo*, 281 F.3d at 576–77 (citing *Cole*, 443 N.E.2d at 170). Ohio courts will consider an ineffective assistance of counsel claim based on evidence outside the record in a post-

conviction petition.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *State v. Smith*, 477 N.E.2d 1128, 1131 n.1 (Ohio 1985); *Cole*, 443 N.E.2d at 170–71.

Landrum's trial counsel continued to represent him on direct appeal, but new co-counsel was also appointed.  The Ohio Court of Appeals held that Landrum's new counsel could have raised claims of ineffective assistance of trial counsel on direct appeal so *res judicata* barred him from raising the claims in a post-conviction petition. The court cited *Cole*, *State v. Lentz*, 639 N.E.2d 784 (Ohio 1994), *State v. Zuern*, Nos. C-900481, C-910229, 1991 WL 256497 (Ohio Ct. App. Dec. 4, 1991), and two other unpublished decisions from 1998 and 1992 in support of its decision.  *Id.*  The court also noted a contrary decision, *State v. Evans*, No. L-97-1134, 1998 WL 351884 (Ohio Ct. App. June 19, 1998).  *See Landrum III*, 1999 WL 22626, at *11–12.  The Ohio Supreme Court has since rejected the application of *res judicata* to defendants in Landrum's situation.  *See State v. Hutton*, 797 N.E.2d 948, 957 (Ohio 2003).  Thus, under current Ohio law, Landrum proceeded properly by raising his ineffective assistance of counsel claims in his post-conviction petition rather than on direct appeal.

We addressed the overlapping trial and appellate counsel issue in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000).  In *Combs*, the defendant was represented by two attorneys at trial.  One of these continued his representation on direct appeal and was joined by new co-counsel.  The Ohio Court of Appeals dismissed the ineffective assistance of counsel claims Combs brought in his post-conviction petition under the *res judicata* doctrine because the court held that he could have raised them on direct appeal. When Combs raised these claims in his *habeas* petition, the state argued that he had defaulted them.  We held that, because *Zuern* was not decided until after the state court of appeals had ruled on Combs's direct appeal, and *Cole* did not address the situation in which trial counsel continues on appeal with the addition of a new co-counsel, we were "unable to conclude that a firmly established state procedural rule existed."  *Combs*, 205 F.3d at 277.  Accordingly, we held that Combs's claims were preserved for review.  *Id.*

Landrum was convicted in 1986 and completed his direct appeals in 1990.  *Zuern* was decided in December 1991.  As in *Combs*, it does not appear that a firmly

established state procedural rule existed when Landrum filed his direct appeal. Thus, we do not rely upon the Ohio Court of Appeals' post-conviction *res judicata* ruling, which held that Landrum procedurally defaulted his ineffective assistance of trial counsel claims by not raising them on direct appeal. *See Seymour*, 224 F.3d at 555–56; *Maupin*, 785 F.2d at 138. Under current Ohio law, Landrum properly waited until he filed his post-conviction petition to raise claims of ineffective assistance of trial counsel because one of the attorneys who represented him at trial also represented him on appeal. Accordingly, the ineffective assistance of counsel claims Landrum raised in his post-conviction petition are preserved for *habeas* review. To reiterate our holding above, this does not resuscitate Landrum's claim about Coffenberger's testimony because, unlike the rest of his guilt-phase ineffective assistance claims, Landrum never presented the state courts with that aspect of his attorney's performance and his failure to do so is not excusable.

Landrum's remaining guilt-phase ineffective assistance of counsel claims are without merit. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The district court properly held that Landrum did not allege or show prejudice from his counsel's alleged lapses. As indicated above, Landrum argues that counsel failed to conduct a proper investigation or interview potential witnesses, failed to present important lay testimony, and failed to present needed expert testimony. The magistrate judge reproduced Landrum's list of potential witnesses and their expected testimony in the report and recommendation to deny these claims. The lay witnesses would have testified about Swackhammer's preparations for burglarizing the victim's home.

Testimony was in fact introduced at trial that Swackhammer talked about burglarizing the victim's home beforehand, however, so more testimony along those lines would have had little impact. The police received an anonymous note suggesting that Swackhammer confessed to his girlfriend Louise Hughes. Landrum faults his trial counsel for not following up on this lead but has not presented any evidence that Swackhammer actually made such a confession.

Landrum also alleged that his counsel failed to obtain a pathologist to review the autopsy and findings of the coroner. He argues that such an expert could have determined whether the physical evidence was consistent with Landrum's account of the murder. At trial, Landrum's counsel cross-examined the state's pathologist to establish that the victim's slashed throat would have been expected to spurt blood, cross-examined a police officer about the blood he saw on the walls, and questioned other witnesses to suggest that there was no blood found on the shorts Landrum wore on the day of the murder. Using an expert witness to review the autopsy would not likely have strengthened these points or changed the outcome of the case.

Landrum argues that his trial counsel should have established that the witnesses who testified that he confessed were runaways who stood to gain favorable treatment from the juvenile court if they testified as the prosecutor wanted. Landrum does not indicate what specific charges the juveniles were facing, if any, or what favorable treatment they might expect. In any event, the witnesses' ages were brought out at trial, and some of them mentioned that they were runaways. Given the vagueness of these allegations, it is speculative at best that the prospect of unspecified favorable treatment would have swayed the juveniles to risk prosecution by giving false testimony. Landrum has not shown that his counsel's alleged lapses in this area prejudiced him.

Because he cannot show prejudice, Landrum has not shown that any of his trial counsel's other alleged guilt-phase errors deprived him of a fair trial. *See Strickland*, 466 U.S. at 687; *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001).

IV.

Landrum asserted that the trial court denied him the rights to compulsory process, a fair trial, and due process under the Sixth and Fourteenth Amendments when it refused to grant immunity to Swackhammer and allowed Swackhammer to avoid testifying by invoking his Fifth Amendment privilege against self-incrimination. Because the Ohio courts denied Landrum relief on this claim under state law and there is no clearly established federal constitutional right to compel the immunization of a witness by a trial court, Landrum is not entitled to relief on this claim.

A.

Landrum filed a motion in the trial court to grant Swackhammer immunity from prosecution. Swackhammer had been adjudicated delinquent in juvenile court for his role in the offenses but had not completed the appeal process. The trial court denied Landrum's motion, holding that Landrum had the right to subpoena Swackhammer but that the court could not grant Swackhammer immunity. At trial, the prosecution called Swackhammer as a witness, but he asserted his Fifth Amendment privilege. He did not respond to either prosecution or defense questioning.

In affirming the trial court on direct appeal, the Ohio Court of Appeals cited an Ohio Supreme Court decision, *State ex. rel. Leis v. Outcalt*, 438 N.E.2d 443, 445 (Ohio 1982), for the principle that, under Ohio law, immunity may only be granted by the trial court upon request of the prosecution. *Landrum I*, 1989 WL 4244, at *14. The Ohio Supreme Court also denied Landrum relief, holding that, under Ohio law, trial courts did not have the authority to immunize defense witnesses. *Landrum II*, 559 N.E.2d at 725. The court observed that Landrum had not established that Swackhammer's testimony would have helped him, that Landrum did not request the prosecutor to seek statutory immunity under Ohio Rev. Code § 2945.44, and that Landrum had not "suggested prosecutorial misconduct in immunizing some witnesses but not others for a nefarious purpose." *Id.* at 726.

The district court held that the Ohio Supreme Court's resolution of Landrum's claim was a state law question and, thus, not reviewable in federal court on habeas. The court went on to conclude that Landrum's claim was without merit under Ohio law because Landrum did not request that the prosecutor grant Swackhammer immunity, Landrum did not allege prosecutorial misconduct, and Landrum did not establish that Swackhammer's testimony would have been favorable to his defense. *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at *158–59.

### B.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68. Under well-established precedent, "[f]ederal *habeas corpus* relief does not lie for errors of state law." *Id.* at 67; *see also Lewis*, 497 U.S. at 780 (1990).

The district court properly denied this claim as limited to state law, and under *Estelle*, we may not overturn a state court ruling on state law unless the law itself violates the federal Constitution. We have rejected repeatedly the notion that there is a federal constitutional right to compel a federal prosecutor to immunize a defense witness. *See, e.g.*, *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991) ("[F]ederal courts do not have the inherent power to immunize witnesses whose testimony is essential to an effective defense."); *United States v. Pennell*, 737 F.2d 521, 527 (6th Cir. 1984); *United States v. Lenz*, 616 F.2d 960, 962 (6th Cir. 1980). Nor has such a claim of a federal constitutional violation succeeded in *habeas* proceedings. *See, e.g.*, *Autry v. Estelle*, 706 F.2d 1394, 1401 (5th Cir. 1983). Indeed, we have even declined to recognize an exception to this rule for circumstances in which the government's failure to immunize a witness constituted prosecutorial misconduct. *United States v. Medina*, 992 F.2d 573, 586 (6th Cir. 1993) (discussing cases from the Seventh, Ninth, and District of Columbia Circuits). More importantly, whatever the case law from the circuit courts may say, Landrum has not shown that a right to have witnesses immunized by the trial court was "clearly established" by Supreme Court precedent at the time of the relevant state court decisions. 28 U.S.C. § 2254(d); *Smith*,

130 S.Ct. at 1388. None of the Supreme Court cases he cites dealt with a trial court's purported constitutional duty to immunize witnesses.

Because the Ohio courts denied Landrum relief on this claim under state law and there is no federal constitutional right to compel a witness's immunization, Landrum is not entitled to relief on this claim.

V.

Landrum challenged the district court's denial of his motion to supplement the record. Landrum moved the district court for an evidentiary hearing in order to present the testimony of several witnesses, including homicide reconstruction expert Wayne Hill. The magistrate judge denied the motion with respect to Hill. The district court upheld that decision. Landrum later moved to expand the record under Rule 7 of the Rules Governing § 2254 Cases to include an affidavit by Hill. The magistrate judge denied the motion because Landrum had not presented Hill's testimony to the state courts and because Hill's affidavit did not demonstrate that he was competent to testify about the subjects on which he was offered as an expert under the standards adopted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

"This court reviews a district court's decision to expand the record under Rule 7 for an abuse of discretion." *Levine v. Torvik*, 986 F.2d 1506, 1517 (6th Cir. 1993), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995); *see also Apanovitch v. Houk*, 466 F.3d 460, 478–79 (6th Cir. 2006). Under AEDPA, a prisoner may introduce new evidence in support of a claim in the district court "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (citing *Williams*, 529 U.S. at 431–37). A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id*. at 435.

We hold that the district court did not abuse its discretion in denying Landrum's motion to expand the record because he has not shown that the factual predicate of Hill's affidavit could not have been discovered previously through the exercise of due diligence. *See* 28 U.S.C. § 2254(e)(2); *Holland*, 542 U.S. at 652–53.   Landrum argued that Hill's affidavit was relevant to his claims that his trial counsel was ineffective for failing to request the assistance of necessary experts and that the trial court should have appointed a pathologist to assist his trial counsel.  In his November 13, 2000, affidavit, Hill described himself as an expert in homicide events reconstruction.  He reviewed Landrum's trial testimony, Swackhammer's December 22, 1985, statement to the police, and the physical evidence presented at trial.  Hill said that Swackhammer's account did not make sense because Swackhammer said he struck the victim in the head several times but passed out when he saw Landrum cut the victim's throat.  Hill also stated that the physical evidence contradicted Swackhammer's statement that Landrum cut the victim's throat immediately after the victim fell to the ground.  Hill concluded that the physical evidence was consistent with Landrum's testimony.

Hill's opinion was based on a review of the evidence presented at trial and Swackhammer's statement to the police.  These materials were available to Landrum when he filed his post-conviction petition in state court in 1996.  At that time, Landrum submitted affidavits and other materials from many witnesses but none from Hill or any other expert witness on this issue and none claiming that the physical evidence tended to prove that Landrum did not kill the victim.  Landrum argues that he exercised diligence because he requested discovery and an evidentiary hearing in state court and blames the prosecution for opposing discovery.  However, he refers to general requests, but not to any request relating specifically to the need for an expert in homicide reconstruction.  Accordingly, Landrum's requests for discovery in state court did not amount to due diligence in developing the factual basis of the claim he now advances.

Moreover, Hill's affidavit falls short of establishing by clear and convincing evidence that, absent Landrum's trial counsel's failure to have an expert witness testify as to the manner of the victim's death, no reasonable factfinder would have found

Landrum guilty.  *See* 28 U.S.C. § 2254(e)(2)(B).  Swackhammer did not testify at trial, nor was his statement entered into evidence.  Thus, whether or not his version of how the victim was killed made sense was not part of the jury's assessment.  The jury heard Landrum's account and that of the state's pathologist.  Landrum's trial counsel brought out the fact that little or no blood was found on Landrum's clothes, in spite of the pathologist's testimony that the victim's fatal injuries would have spurted blood.  Landrum and his trial counsel presented a version of events that identified Swackhammer as the principal offender, but the jury apparently was not swayed.  Hill's testimony would not have made a difference.  Thus, we affirm the district court's decision on this claim.

VI.

Landrum asserted that the trial court violated his constitutional rights when it excluded from the mitigation phase evidence pertinent to the circumstances of the offense.  Landrum offered testimony by Coffenberger, who would have said that Swackhammer told him that he, and not Landrum, cut the victim's throat.  Landrum also complained that the trial court excluded evidence that Swackhammer had a violent nature and routinely carried a knife.  Landrum also alleged that the state supreme court usurped the role of the jury when it reweighed the evidence to cure the trial court's error of excluding relevant mitigating testimony.  We consider these issues together and affirm the district court because the Ohio Supreme Court's decision to consider in its reweighing analysis mitigating evidence that was excluded at trial was not contrary to Supreme Court precedent.

A.

During the mitigation hearing, Landrum's counsel announced his intention to call Coffenberger as a witness.  According to the defense, Coffenberger was prepared to testify that he spoke with Swackhammer the day after the murder and Swackhammer told him that he cut the victim's throat.  Counsel wished to counter the state's "principal offender" aggravating factor and support Landrum's "participation in the offense" mitigating factor.  *See* Ohio Rev. Code §§ 2929.04(A)(7), (B)(6).  The prosecution

argued that Coffenberger's testimony was inadmissible hearsay and was not corroborated. Ohio R. Evid. 804(b)(3). The government noted that, in earlier statements to the police, Coffenberger denied seeing either Swackhammer or Landrum after the killing. The state also referred to Coffenberger's past felony convictions. The state trial court found that, although the testimony was relevant, it was inadmissible as hearsay.

The Ohio Supreme Court found fault with this ruling but reweighed the evidence and held that Landrum's sentence was appropriate despite the error. The court found that Swackhammer was unavailable as a witness because he had invoked his Fifth Amendment rights, that the statement was a declaration against penal interest because it admitted his guilt as a principal to the murder, and that Landrum's testimony and the lack of blood on Landrum's clothing corroborated Swackhammer's statement. *Landrum II*, 559 N.E.2d at 720. The court also noted that the rules of evidence do not apply strictly in sentencing proceedings. *Id*. at 721. Thus, it held Coffenberger's testimony admissible. The court then considered Coffenberger's proferred testimony as part of its independent assessment and weighing of the evidence. *Id*. (citing Ohio Rev. Code § 2929.05(A), and *Clemons v. Mississippi*, 494 U.S. 738 (1990)). The court found that Landrum was a principal offender in the aggravated murder, relying on testimony that Landrum planned the burglary, surveilled the victim's apartment, and told a witness that he would kill the victim if he returned during the burglary. *Id*. The court further found that Landrum signaled Swackhammer to hit the victim, wrestled with the victim, told Swackhammer to bring a knife, and cut the victim's throat. *Id*. at 730. The court also held that the fact that Swackhammer regularly carried a knife was before the jury and that Landrum made no proffer and preserved no error as to Swackhammer's allegedly violent character. *Id*. at 721.

The district court applied harmless error analysis and held that the failure to admit Swackhammer's statement by way of Coffenberger's testimony at the mitigation phase did not have a substantial and injurious effect on the verdict at that stage of the case. *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at *153–54. It noted that by the time Landrum offered this evidence at sentencing, the jury had already found him to be a

principal offender beyond a reasonable doubt.  *Id*. at *152.  Moreover, the district court relied upon the reasoning of the Ohio Supreme Court in its reweighing analysis.  Finally, the district court found that Landrum's counsel was able to elicit testimony about the type of knife Swackhammer carried.  *Id*. at *154–55.

### B.

The Supreme Court has held that juries must be permitted to consider all relevant mitigating evidence in a capital case.  *Mills v. Maryland*, 486 U.S. 367, 374 (1988); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  In *Clemons*, a state appellate court affirmed the imposition of a death sentence after reweighing the aggravating and mitigating factors and eliminating an aggravating factor improperly introduced to and considered by the jury.  494 U.S. at 742–44.  The Supreme Court found no constitutional error in this procedure and held that the "[f]ederal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review."  *Id*. at 741.

"[U]nder Ohio law, the appellate courts are not merely allowed but required to 'independently weigh' the aggravating circumstances versus the mitigating factors." *Cooey v. Coyle*, 289 F.3d 882, 908 (6th Cir. 2002) (emphasis omitted).  Applying *Clemons*, we have held that reweighing is appropriate to cure the trial court's failure to consider a mitigating factor.  *See Baston v. Bagley*, 420 F.3d 632, 638 (6th Cir. 2005). We found that "there is no reason that an appellate court could properly reweigh after removing an aggravating factor from consideration, but could not do so after adding an additional mitigating factor."  *Id*.  In light of *Clemons* and *Baston*, the Ohio Supreme Court's reweighing of the mitigation evidence cured any possible error on the part of the trial court and its decision was neither contrary to nor involved an unreasonable application of governing federal law.  *See Williams*, 529 U.S. at 412–13.  Although Coffenberger's statement was excluded from the trial record, the Ohio Supreme Court considered Landrum's proffer of its contents as if it were in evidence, thus effectively

giving Landrum the benefit of additional mitigation testimony. *Landrum II*, 559 N.E.2d at 730. Although the Ohio Supreme Court did not rule for Landrum ultimately, its decision to consider Coffenberger's previously excluded statement in its reweighing analysis was to Landrum's advantage. Under *Clemons* and *Baston*, this procedure was not contrary to Supreme Court precedent and, accordingly, we affirm, albeit on different grounds.

## VII.

Landrum alleged that the trial court violated his constitutional rights by denying his trial counsel's repeated requests for a continuance of the trial to complete investigations and to prepare guilt-phase and penalty-phase defenses. Because the trial court's decision to deny a continuance was reasoned and not arbitrary, and Landrum is unable to show that he suffered actual prejudice from the trial court's decision, we affirm the district court's decision.

## A.

On direct appeal, the Ohio Supreme Court found that Landrum's requests for delay arose from defense counsel's "tactical desire to devote their efforts to extensive pretrial motions and to allow the state public defender's investigators to interview witnesses. Denial of a continuance requested pursuant to counsel's tactical design is permissible." *Landrum II*, 559 N.E.2d at 721. The court observed that trial counsel had four full months to prepare for trial and over five months to prepare for sentencing, that counsel investigated numerous leads and abandoned some, and that counsel called numerous witnesses at sentencing. "The record demonstrates from the inception a zealous, earnest, intelligent and dedicated defense effort. Under these circumstances, the trial judge did not abuse his discretion by denying a continuance." *Id*. at 722. Landrum renewed this claim in his post-conviction petition, which the trial court held to be barred by *res judicata*. Affirming this decision, the Ohio Court of Appeals cited the Ohio Supreme Court's analysis and held that the new evidence Landrum submitted was cumulative and insufficient to demonstrate a constitutional violation. *Landrum III*, 1999 WL 22626, at *6. In *habeas* proceedings, the district court held that the state

courts' resolution of the claim was consistent with federal law, finding that Landrum failed to show prejudice, that he was able to present extensive mitigation evidence, and that the evidence was cumulative. *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at *174.

## B.

A trial court's decision to grant or deny a continuance is a matter of discretion. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Bennett v. Scroggy*, 793 F.2d 772, 774–75 (6th Cir. 1986).   As we held in *Powell v. Collins*, "[a]bsent proof of a violation of a specific constitutional protection, a *habeas* petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process."   332 F.3d 376, 396 (6th Cir. 2003) (citing *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)).   The denial of a continuance constitutes a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'. . . ." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar*, 376 U.S. at 589)).   As *Morris* and *Ungar* indicate, the denial of a continuance will rarely give rise to a constitutional violation and "[t]he circumstances of a particular case determine whether the denial of a continuance is so arbitrary as to violate due process." *Burton v. Renico*, 391 F.3d 764, 773 (6th Cir. 2004) (citing *Ungar*, 376 U.S. at 589).   In addition, "[t]o demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997) (internal quotation marks and citation omitted).   "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense." *Powell*, 332 F.3d at 396.

The relevant factors in determining whether a continuance was properly denied include: (1) the length of the requested delay; (2) whether other continuances had been requested and granted; (3) whether the delay was for legitimate reasons; (4) the inconvenience to the parties, witnesses, counsel, and the court; (5) whether the defendant contributed to the circumstances giving rise to the request; (6) whether denying the

continuance resulted in prejudice to the defendant; and (7) the complexity of the case. *See id.* (citing *United States v. Burton*, 584 F.2d 485, 490–91 (D.C. Cir. 1978)).

We hold that the Ohio Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law. Landrum was indicted in September 1985 and the trial court set a trial date of December 16, 1985. On November 19, 1985, Landrum's counsel moved for a continuance and the court rescheduled the trial for February 10, 1986. The court denied subsequent pre-trial motions for delay and Landrum was convicted on February 21, 1986. *Landrum II*, 559 N.E.2d at 721. The penalty phase began on March 17, 1986, after the trial court granted Landrum an additional one-week continuance. Although capital cases are complex and there is no evidence in the record that Landrum requested delays for an illegitimate reason, the trial court's decision to deny another continuance in consideration of the convenience of the parties, counsel, and the court after granting Landrum continuances before each phase of the trial was not "unreasoning and arbitrary." *Morris*, 461 U.S. at 11–12. Moreover, Landrum has not shown that he was prejudiced by the trial court's case management. For example, Landrum claims that the trial court's refusal to continue the trial deprived him of Coffenberger's testimony, but the record indicates that Landrum's counsel did not introduce Coffenberger's testimony in the guilt phase because they thought it was inadmissible hearsay, not because they had insufficient time to investigate and prepare the witness. Landrum has identified no evidence relevant to the guilt phase that more time would have permitted him to discover. *See Powell*, 332 F.3d at 396.

With respect to the mitigation phase, Landrum did point to some new evidence concerning his youth. The clinical psychologist he presented in post-conviction proceedings painted him in a more sympathetic light but that expert relied largely on the same information available to trial counsel. Trial counsel had considered but rejected using two other experts in the mitigation phase on this issue. Any deficiencies in the mitigation phase were the result of counsel's strategic choices and not the trial court's refusal to delay the trial. Thus, the district court properly denied this claim.

VIII.

Landrum alleged that he was denied the right to the effective assistance of counsel during the mitigation phase of his trial. He argues that his counsel: failed to provide information and leads to the mitigation investigators; failed to collect records pertaining to his education, mental health, family history, and development; failed to present testimony about or records from his medical treatment, psychological treatment, institutional functioning, and educational experiences; failed to seek the assistance of and present the testimony of a psychologist or psychiatrist; failed to seek the assistance of an expert on substance abuse; failed to ensure that a complete psychosocial history was prepared and presented to the necessary experts; and admitted to the jury in closing argument, "I don't know, I'm not a psychologist, I'm just trying to piece together what you all heard."

A.

In his post-conviction petition, Landrum attached affidavits from mitigation specialists, a clinical psychologist, attorneys, jurors, Coffenberger, and himself. The trial court denied the petition without an evidentiary hearing. It concluded that *res judicata* barred this claim because Landrum had new co-counsel on appeal and the affidavits were cumulative. The Ohio Court of Appeals affirmed, holding that *res judicata* barred claims that did not rely on evidence outside the record even when trial counsel assisted the new co-counsel on appeal. *Landrum III*, 1999 WL 22626, at *12. The appeals court went on to hold that the new materials concerning Landrum's social history and substance abuse were insufficient grounds for relief because they were merely cumulative to the evidence presented at the mitigation phase. *Id.* at *13. The court noted that trial counsel's decision to use psychiatric testimony, but not underdeveloped evidence of Landrum's drug and alcohol abuse, constituted sound trial strategy. *Id.* In his Rule 26(B) application in September 1998, Landrum alleged that his appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel at the mitigation phase. As described above, the Ohio Court of Appeals held that Landrum had not shown good cause for delaying this application to reopen his direct

appeal.  *Landrum IV*, 720 N.E. 2d at 525.  In federal proceedings, the district court concluded that counsel's performance did not fall below an objective standard of reasonableness.  *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at \*99–101.

B.

At the outset, we note that under *Hutton*, 797 N.E.2d at 957, and *Combs*, 205 F.3d at 277, this claim is not procedurally defaulted because Landrum was not obligated to raise ineffective assistance of counsel on direct appeal when his trial attorney assisted in the appeal.

Claims of ineffective assistance of counsel at the penalty phase require us to determine whether counsel reasonably investigated the defendant's background and presented mitigating evidence to the jury.  *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).  An attorney "has a duty to investigate the circumstances of [his client's] case and to explore all avenues relevant to the merits of the case and the penalty in the event of a conviction," and "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself.  Investigation is essential to fulfillment of these functions."  *Powell*, 332 F.3d at 399 (citations and emphasis omitted); *see also Hamblin v. Mitchell*, 354 F.3d 482, 486–88 (6th Cir. 2003) (using American Bar Association standards to define prevailing professional norms).  To assess the potential prejudice to a defendant at sentencing, the reviewing court must reweigh the evidence in aggravation against the total available mitigating evidence, adduced at trial and in post-conviction proceedings, *Wiggins*, 539 U.S. at 536, to determine whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *Strickland*, 466 U.S. at 695.  The petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented at sentencing, not just cumulative mitigation evidence.  *See Broom*, 441 F.3d at 410; *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005).  Thus, we must review the mitigation evidence presented at trial and in the post-

conviction petition to determine whether the latter differed in strength and subject matter, and, if so, whether Landrum was prejudiced by its absence.

During the mitigation phase, counsel presented numerous witnesses. Landrum's family members, two of his friends, two former girlfriends, and the pastor of his church testified. Landrum's mother stated that he started to drink alcohol and take drugs in ninth grade, that he overdosed on drugs when he was sixteen, and that he was not violent. On cross-examination, she revealed that Landrum once stole a car after being sent to reform school. His step-father testified that Landrum's behavior changed after the overdose and that court hearings, counseling, and confinement could not control his behavior. Landrum's other relatives described him as easygoing and none remembered his being violent. They said that he drank heavily and used drugs as he grew older. One of Landrum's friends said that Landrum's family was strict, that Landrum's step-father whipped him, and that Landrum was scared of his step-father. Landrum's former girlfriends testified that he drank alcohol and used marijuana and was hard to get along with when drunk or high. Testifying on his own behalf, Landrum said that he was very sorry for what had happened and asked the jury to spare his life. On cross-examination, he testified that he did not remember telling anyone that he killed the victim and asked for the forgiveness of the victim's family.

In his closing argument, defense counsel argued that there was reason to doubt that Landrum was the principal offender. He reminded the jury that although the victim's blood spurted from his injury, no blood was found on Landrum's clothes. He next said that because Landrum took drugs, he did not remember what he said to other people. Counsel also pointed to Swackhammer's behavior, size, and habit of carrying a knife to persuade the jury to doubt Landrum's degree of participation in the murder. Counsel appealed to the jury for mercy, stating that Landrum's history and character revealed a defect somewhere along the line and that Landrum had changed, was genuinely remorseful, and wanted to help others avoid his fate. Landrum's attorney then pointed to the statutory mitigating factors in Landrum's favor, including his youth, his lack of a substantial criminal history, and his arguably moderate degree of participation

in the murder. He argued that Landrum was not violent except when intoxicated by drugs or alcohol. He contended that Landrum was excessively praised as a child and brought up to think that he could do no wrong. Counsel added that Landrum's move to Ohio was a change in environment that should be considered a mitigating factor. Turning to Landrum's family life, counsel argued that his client received inconsistent discipline from authority figures. He noted that Landrum had graduated from high school but that he became dependent on alcohol and drugs to medicate himself for the failures in his life. Counsel stressed Landrum's remorse, repentance, and love of his family. He asked the jury to punish Landrum, but not to impose the death penalty.

In post-conviction proceedings, Landrum submitted affidavits from a social worker experienced in mitigation investigations, a clinical psychologist, an attorney not involved in his case, his trial counsel, his appellate counsel, the attorney who submitted his post-conviction petition, the mitigation investigators who researched Landrum's past in 1986, mitigation specialists, attorneys with the Ohio public defender's office, two jurors from the trial, and Coffenberger. He also submitted a transcript of a police interview with Swackhammer, his own affidavit, descriptions of executions, newspaper articles about his conviction, and other materials.

The social worker concluded that the mitigation investigation was inadequate because it had not begun until late January 1986, less than a month before trial started. She also reported that most of the interviews conducted for mitigation purposes took place after the guilt phase ended on February 21, 1986, less than a month before the penalty phase began on March 17, 1986. She stated that it takes three to six months to compile a mitigation case. She also presented evidence about Landrum's early life, including the chaotic household in which he was raised until the age of five, the effects of his mother's remarriage and the move to Ohio, his step-father's drinking and physical abusiveness, the death of family members, and his being teased and taunted in school. The social worker averred that Landrum had serious emotional problems that required an expert evaluation. She believed that the mitigation team had not adequately explored Landrum's alcohol and drug abuse, such as his overdose at the age of sixteen. In her

opinion, the team had not explored Landrum's inability to adjust to prison; indications of drug abuse, depression, and ADHD; and possible sexual abuse when he was five. The social worker concluded that the witnesses who testified on Landrum's behalf were not prepared and that there were other witnesses who were willing to testify but had not been contacted.

The clinical psychologist administered a series of tests to Landrum. He presented additional evidence supporting the social worker's testimony and documented Landrum's drug use. Landrum had progressed from the occasional use of marijuana to daily use of various pills to cope with his strained relationships with his step-father and left home for days at a time. He continued to binge through adolescence, culminating in his dishonorable discharge from the Navy at the age of twenty. The psychologist went on to describe Landrum's depression and inability to stop using alcohol and drugs. Landrum was diagnosed with dysythmic disorder and substance dependence. The psychologist described him as having flat affect, low self-esteem, and feelings of helplessness or hopelessness. He opined that these disorders were the result of Landrum's physical and sexual abuse and other early life experiences. He termed Landrum's addiction inevitable given these factors and opined that, at the time of the murder, Landrum was dependent on alcohol, sedatives, and marijuana, which aggravated his dysythmic disorder.

Trial counsel averred that the trial court denied him sufficient time to prepare his mitigation defense. Specifically, he averred that more time would have permitted him to obtain a psychological evaluation, to investigate and develop a full drug- and alcohol-abuse history, to obtain records regarding his client's ability to adapt to confinement, to develop information regarding Swackhammer's culpability, and to retain expert witnesses. Counsel explained that he was afraid to present underdeveloped evidence of Landrum's substance abuse for fear that it would be used by the jury as an aggravator. The mitigation investigators faulted the district court for not granting continuances. They claimed they were unable to interview all potential witnesses and obtain all relevant records. Another mitigation specialist was asked to review a letter from an

individual who claimed to have spoken with people who knew Landrum in elementary school who had said that Landrum had been teased because his family was poor. The specialist claimed that the letter offered potentially significant mitigation information and numerous leads.

Given the evidence presented during the mitigation phase, we cannot conclude that trial counsel failed to investigate Landrum's background or to present mitigating evidence to save him from the death penalty. *See Wiggins*, 539 U.S. at 521–22. The evidence gave the jury an overall view of Landrum's background, some insight into his troubled youth, and accounts of his substance abuse. Indeed, investigators interviewed witnesses, who testified, and researched records, which were submitted into evidence. Landrum points to trial counsel's failure to use a mental health expert. However, the trial court authorized funds to pay Dr. Nancy Schmidtgoessling, a psychologist proposed by Landrum's attorney. Schmidtgoessling examined Landrum by December 4, 1985, but had not provided counsel with anything in writing at that time. Counsel also withdrew a request to have her examine Landrum after the guilt phase and before the mitigation phase, and declined to have Landrum examined by a mental health expert named by the trial court. In a pre-trial hearing on March 11, 1986, counsel stated that Schmidtgoessling never reduced her findings to writing, and no report by her appears in the record.

On this record, Landrum has not shown that his representation was constitutionally deficient. The strategic decision not to present Schmidtgoessling's underdeveloped testimony to the jury contrasts sharply with the cases in which we have found violations of *Wiggins* and *Strickland*. *See, e.g.*, *Morales v. Mitchell*, 507 F.3d 916, 934 (6th Cir. 2007) (counsel did not present evidence of childhood abuse, a dysfunctional family situation, head injuries, and substance abuse); *Hamblin*, 354 F.3d at 490–91 (counsel conducted no mitigation investigation); *Coleman v. Mitchell*, 268 F.3d 417, 450–52 (6th Cir. 2001) (counsel failed to present evidence that the defendant was abandoned by his mother, was abused by his grandmother, and that his grandmother used her home as a brothel and gambling house and exposed him to group sex, bestiality,

and pedophilia); *Carter v. Bell*, 218 F.3d 581, 594–600 (6th Cir. 2000) (counsel failed to investigate and present mitigating evidence of the defendant's poor, violent, and unstable childhood).

Moreover, Landrum is unable to show prejudice from any alleged deficiency in his representation. Trial counsel presented most of the same facts that the post-conviction mitigation witnesses said should have been presented. Even if some of the information offered in post-conviction proceedings by the social worker and clinical psychologist, such as the evidence that Landrum was abused by his step-father, would have placed Landrum in a more favorable light in comparison with the testimony of his family in the mitigation phase, it could have been outweighed by unfavorable evidence offered post-conviction that Landrum was disciplined in the Navy and received a dishonorable discharge. Such information would have undermined trial counsel's claim that Landrum functioned well in structured settings.

The most significant difference between the evidence presented at the mitigation hearing and the post-conviction petition evidence is that at the hearing no mental health expert testified on Landrum's behalf. Trial counsel suggested that events in Landrum's life somehow caused him to go astray, but counsel did not present any expert testimony to support this theory and was unable to articulate what went wrong. The prosecution seized on defense counsel's efforts to portray Landrum's substance abuse and the ineffectiveness of the juvenile justice system as mitigating factors. In contrast, the post-conviction clinical psychologist explained that the events and circumstances of Landrum's life contributed to his depression and substance abuse, that Landrum's substance abuse was not treated properly, and that his substance abuse affected his judgment at the time of the murder. Although Landrum's family members testified that he was surrounded by people who loved him as a child, the psychologist described Landrum's early life as chaotic and his time in Ohio as severely troubled. Landrum was diagnosed with a form of depression after psychological testing.

Even when we consider the testimony of a mental health expert, we cannot say that Landrum has come forward with new evidence that differs significantly both in

strength and subject matter from the evidence actually presented at sentencing. *See Broom*, 441 F.3d at 410; *Clark*, 425 F.3d at 286. Moreover, the jury heard that Landrum bragged about brutally slashing the throat of his victim. Thus, we do not find that there is a reasonable probability that the jury would have concluded that "the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland*, 466 U.S. at 695. Indeed, the facts in this case are similar to others in which we have found no prejudice. *See, e.g.*, *Johnson v. Bell*, 344 F.3d 567, 573–74 (6th Cir. 2003) (although testimony from family members would have helped to humanize the defendant, the jury could have concluded that he was even more culpable because he had enjoyed a loving family and yet had murdered his wife); *Martin v. Mitchell*, 280 F.3d 594, 613–14 (6th Cir. 2002) (defendant did not show prejudice at the mitigation phase where family members testified about his background and a psychological report was given to the jury); *Scott v. Mitchell*, 209 F.3d 854, 880–81 (6th Cir. 2000) (finding that potential mitigating circumstances were overwhelmingly negated by other evidence about the defendant's background). In Landrum's case, nothing in the post-conviction record suggests that his childhood was drastically different from what the jury heard or that he suffers from a mental or physical condition that would explain or significantly mitigate his crimes. *See Hamblin*, 354 F.3d at 490–91 (no investigation by defense counsel); *Skaggs v. Parker*, 235 F.3d 261, 269–75 (6th Cir. 2000) (post-conviction evidence indicated that the defendant was mentally impaired, suffered from organic brain damage, and exhibited psychotic, paranoid, and schizophrenic behaviors). There is no reasonable probability that the jury's verdict would have been different had it heard the cumulative evidence in the post-conviction record.

Landrum has failed to establish that he received ineffective assistance of counsel in the sentencing phase of his trial. The state court's resolution of his claims regarding his social history and history of substance abuse was not contrary to or an unreasonable application of clearly established Supreme Court law.

IX.

Landrum alleged that the trial court violated his constitutional rights by failing to provide him with an independent, competent psychologist when this service was reasonably necessary to present mitigation evidence. Landrum argues that an independent psychologist would have analyzed his psychological and social history and adduced testimony as to his early life and developmental experiences, the development of his personality, his family's dynamics, his potential for success or failure in a structured system, his medical history, his abuse of drugs and alcohol, his emotional and psychological functioning, and the effect of his psycho-social issues on his capacity to form the requisite intent at the time of the murder.

A.

Landrum first raised this claim in his post-conviction petition. The trial court ruled that *res judicata* barred the claim because he should have raised it on direct appeal. Appealing this decision, Landrum argued ineffective assistance of trial counsel and the denial of his requests for a continuance. He did not specifically argue the issue of the appointment of a psychologist, but mentioned it along with forty-two other claims for relief. The Ohio Court of Appeals held that Landrum was not entitled to relief and that the trial court did not err by denying his request for an evidentiary hearing. *Landrum III*, 1999 WL 22626, at *11. Landrum then raised this claim as part of a claim of ineffective assistance of appellate counsel when he applied to reopen his appeal pursuant to Rule 26(B). The Ohio Court of Appeals held that Landrum's application was untimely and that he had not shown good cause for his delay. The court also found that *res judicata* barred relitigation of the issues that Landrum had raised in previous proceedings. The Ohio Supreme Court affirmed this appellate decision. *Landrum IV*, 720 N.E.2d at 525. The district court examined the merits of this claim in *habeas* proceedings and concluded that Landrum was not entitled to a psychological expert because he did not present an insanity defense and that trial counsel exercised strategic judgment in not presenting Schmidtgoessling to the jury. *Landrum VI*, 2005 U.S. Dist. LEXIS 41846, at *233–35.

B.

We find this claim procedurally defaulted for the same reason we found defaulted Landrum's claim that trial counsel was constitutionally ineffective for failing to present Coffenberger's testimony during the guilt phase.  Under Ohio law, *res judicata* bars claims in post-conviction collateral attacks that have been, or could have been, litigated on direct appeal.  *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004).  The Ohio Court of Appeals's reliance on *res judicata* was an adequate and independent state ground to foreclose *habeas* relief in federal court.  *See Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004).  As explained above, a claim of ineffective assistance of appellate counsel may excuse a procedural default so long as this claim is not itself procedurally defaulted. *Edwards*, 529 U.S. at 453.  In Ohio, the vehicle for raising an ineffective assistance of appellate counsel claim is an application under Rule 26(B).  The state courts dismissed Landrum's Rule 26(B) application as untimely.  Because the timeliness requirements of Rule 26(B) were firmly established and regularly followed by September 1998, they are an adequate and independent state procedural bar to *habeas* review.  *See Parker*, 543 F.3d at 861–62; *Fautenberry*, 515 F.3d at 641.

X.

For the foregoing reasons, we reverse the district court's grant of *habeas corpus* to Landrum on the basis of ineffective assistance of counsel and affirm the district court's decision in all other respects.